**BARNETT v. EQUITABLE TRUST CO. OF NEW YORK et al. (UNITED STATES, Intervener).**

**EQUITABLE TRUST CO. OF NEW YORK v. UNITED STATES.**

Circuit Court of Appeals, Second Circuit.
July 15, 1929.

No. 331.

See, also, 21 F.(2d) 325.

918

Charles H. Tuttle, U. S. Atty., of New York City, and Nat M. Lacy, Sp. Asst. Atty. Gen. (O. H. Graves, of Washington, D. C., on the brief), for appellant.

Patterson, Eagle, Greenough & Day, of New York City, Hummer & Foster, of Henryetta, Okl., and Cochran & Ellison and McCrory & Monk, all of Okmulgee, Okl. (Carroll G. Walter, of New York City, of counsel), for appellees.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. Hand, Circuit Judge (after stating the facts as above). ▌ We hold that the District Court had power to make an allowance out of the fund. Whatever the status before May 27, 1908, of the lands of allottees of the Five Civilized Tribes of whom the Creeks are one, the act of that day (35 Stat. 312), established their position from that time on. They were not to be conveyed before April 26, 1931, "except that the Secretary of the Interior may remove restrictions, wholly or in part, under such rules and regulations concerning terms of sale and disposal of the proceeds for the benefit of the respective Indians as he may prescribe." The property remained the Indian's, but he was restrained in its alienation, except as the Secretary might allow; when the Secretary concurred, he was free, like another owner, to transfer his rights. This applied as well to the proceeds of his land, in this instance to the royalties arising from a lawful lease, as to the realty itself. When, therefore, Barnett with the Secretary's consent gave the securities to the Mission, the funds passed to its hands unrestricted and as free funds.

Only a court could undo the transaction so taking place. This is plain, if Barnett knew enough of what he was about to intend the transfer. In that case title passed, and a court of equity must declare it void. If as the twentieth article of the bill seems to allege, he did not so intend, at least possession passed, and the Secretary could not recall it by virtue of his office; either Barnett or the United States must sue to get it. What either got might have to come back to the Secretary's custody, but his powers would revive only then, and to only so much as in fact did. We can therefore see no reason to say that the court's wings were clipped by restrictions which the Secretary had lawfully, if improvidently, removed, or that it need, or indeed should, have shared its jurisdiction with him. It could, for instance, scarcely be argued that, had the res been meanwhile cared for by a third person, he could not intervene in the suit in his own behalf and secure a determination of his claim, or that he must present it to the Secretary and abide his decision. Congress might perhaps have vested him with such power, but it did not. The res was at large; courts alone could direct its distribution. The situation, therefore, is no different from that often before a court, in which it is necessary to sacrifice part of a property to preserve or regain the rest. The District Court, not being able to decide without evidence and assistance as to the law, properly restored only so much as remained after those services were paid which had enabled it to act, Kendall v. Ewert, 259 U. S. 139, 149, 42 S. Ct. 444, 66 L. Ed. 862. The stake was the remainder, to which alone the restrictions of the statute can apply. The only question is of the proper amount.

▌ Barnett might have sued alone, as he did (Tiger v. Western Investment Co., 221 U. S. 286, 31 S. Ct. 578, 55 L. Ed. 738), or the United States might have sued for him (Heckman v. U. S., 224 U. S. 413, 32 S. Ct. 424, 56 L. Ed. 820); the choice lay with the Attorney General. He did sue alone, and certainly until he procured the intervention of the United States his attorneys might claim for their services as in any other case. In January, 1926, this changed, for the United States then intervened as a party plaintiff, unlike Bailey, who was not a party at all. The Attorney General might, indeed, have imposed it as a condition that Barnett should retire, which would have left the United States in complete charge. He did not, probably for the reason that Barnett's attorneys had already gone so far; but we see no reason why there should not have been two plaintiffs, and why each should not be represented. But, if so, the appellees should not be deprived of fees which they earned under their separate retainer. They had received no intimation that their services were for the United States, which, had it been made, would certainly have provoked a definite understanding. Each plaintiff proceeded in its own behalf, and, while the appellees must in theory abate their claim for any services in fact made unnecessary by the intervention, there need be no such deduction,

for they did substantially all that was done. It is too late now, after the heat of the day, to suggest that their client had been changed sub silentio.

However, we cannot agree that the Oklahoma litigation was part of this suit, or that these services should be paid for here. True, Barnett was an incompetent person, and as such the court would not leave him to his own devices, which were so meager. Bailey appeared as his prochein ami, and the court was satisfied to let him continue. It need not have done so; at any time it might have displaced him and substituted some one else. King v. McLean, etc., Hospital (C. C. A. 1) 64 F. 331, 354, 355, 26 L. R. A. 784; Street, § 459. Hence it was a matter of no moment to this suit what took place thereafter in Oklahoma. Bailey got no authority over the assets in New York by his letters in Oklahoma. Hoyt v. Sprague, 103 U. S. 613, 631, 26 L. Ed. 585; Morgan v. Potter, 157 U. S. 195, 15 S. Ct. 590, 39 L. Ed. 670; Lamar v. Miccu, 112 U. S. 452, 470, 5 S. Ct. 221, 28 L. Ed. 751; Morrell v. Dickey, 1 Johns. Ch. (N. Y.) 153; Kraft v. Wickey, 4 Gill & J. (Md.) 332, 23 Am. Dec. 569; Grimmett v. Witherington, 16 Ark. 377, 63 Am. Dec. 66. Indeed, these were revoked, without effect upon this prosecution. He might have been enjoined, or prohibited, or otherwise prevented from taking action; it would have accomplished nothing. Barnett, and Barnett alone, was the plaintiff; the assets were here, and the District Court would and should have protected him by securing a proper substitute. After the intervention of the United States, this might, indeed, have been unnecessary, though in view of its relative inaction it would still have been wise.

So we cannot see how the appellees can be allowed anything for those services, and in so far as they entered into the allowance the mistake was one of law. The appellees argue that it was a reasonable precaution to contest these proceedings, whether necessary or no; but we cannot agree. We do not think that it was a precaution; to us the litigation seems plainly irrelevant. The appellees, being learned in the law, if not chargeable with such a mistake, at least cannot make it a part of their claim here, for in fact they did not in this activity assist the prosecution at all. Besides, it is doubtful whether there was a mistake, for there was quite another reason why they may have thought it important to keep Bailey a guardian. They had a contract with him for 40 per cent. of the recovery, which they believed, perhaps rightly, was valid, and which depended upon his continued authority.

However, even after these services are excluded, there undoubtedly remained a large amount of labor necessarily involved in the prosecution. Barnett, who had the mentality of a child, could not help; he had been surrounded by those who meant only to fleece him; they would not help. The Department of the Interior would take no action, apparently believing that the money was better employed as it was than Barnett or his heirs could employ it. The evidence had to be drawn from unwilling sources, and the right was not altogether clear. Barnett, as a restricted Indian, was not legally competent to convey, however competent he might personally be, judged by ordinary standards. Congress had put him under the tutelage of the Secretary, merely by virtue of his status, though, if the Secretary approved, this was removed. Doubtless the Secretary's approval, standing alone, was not a conveyance; we may also assume that a conveyance, defective even in its factum, would be the equivalent of none. But it was not clear that Barnett did not actually mean to convey, and, if he did, his gift was not void, but must be set aside because of his personal incapacity. It was possible that a court might hold that, being in any case non sui juris, his personal incapacity was a part of his status, and, that, once the Secretary had approved, acting upon the facts of his case, the gift was valid. We think that the hazard was substantial.

The allowance depends in part upon the amount at stake. Between February 1, 1923, when the gift was made, and November 21, 1927, when the decree was entered, the income falling due under the bonds was less than $140,000, though by how much we do not know, as the market value of the bonds was in some instances above par. Of this Barnett during this period was entitled to about $96,000, regardless of the result, and the total amount involved was therefore substantially less than $600,000. If there be a rule in the District Court that in such cases allowances shall be made upon a basis of one-third of the amount involved, we do not know it and we disapprove it; it certainly has never had our sanction. We do not mean, of course, that a percentage basis is in itself improper; but it cannot be fixed at the same rate for all cases regardless of the amount. The allowance is a payment for legal services, not a speculative interest in a lawsuit. It does not appear whether the District Judge included the Oklahoma litigation with the

920

rest, though we should have expected him to say that he did not, if that were so. Whether he did or not, we think the allowance plainly too large.

It is argued that we should not disturb it, unless there has been an abuse of discretion. Perhaps so, but that phrase means no more than that we will not intervene, so long as we think that the amount is within permissible limits; if our conviction is definite that it is, we cannot properly abdicate our judgment. Had the result been certain, we should have thought $50,000 enough for the work involved, excluding the Oklahoma litigation. As the hazard was real, for the reasons we have given, we think that $100,000 might be allowed, but that appears to us the utmost that could be. It is idle to go into details; such matters are proverbially uncertain, and men will undoubtedly differ about them; but we think it of much importance that in cases of the kind the inducement shall be kept within limits.

The allowance to Bailey we will not disturb.

Award reduced to $100,000 and expenses; decree otherwise affirmed.